**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| THOMAS DUNCAN and VICTOR SEIDMAN, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>        v.<br><br>JERICO  PICTURES,  INC.  d/b/a  NATIONAL PUBLIC DATA,<br><br>                    Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiffs, Thomas Duncan ("Duncan") and Victor Seidman ("Seidman") (collectively, "Plaintiffs"), bring this Class Action Complaint ("Complaint") against Defendant, Jerico Pictures, Inc. d/b/a National Public Data ("NPD" or "Defendant"), as individuals and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions and their counsels' investigation, and upon information and belief as to all other matters, as follows:

<u>**SUMMARY OF THE ACTION**</u>

1.     This is a class action on behalf of individuals whose personally identifying information ("PII") was stolen by hackers as part of a major data breach which occurred in or around April 2024, and which affected Defendant's network.

2.      Defendant is a data broker company specializing in background checks and fraud prevention[1]  and collects and maintains an enormous database of millions of individuals' PII, totaling up to more than *3 billion records* according to Defendant's website.[2] As a data broker, Defendant's business model is to collect information from public data sources, which includes criminal records, employment history and addresses, and then offer that information for sale to businesses—a process colloquially known as "data scraping," or just "scraping."  Upon information and belief, Defendant has also "scraped" PII from non-public, third-party sources.

3.      By taking possession and control of Plaintiffs' and class members' PII, Defendant impliedly assumed a duty to refrain from committing acts or omissions that had a substantial likelihood of resulting in reasonably foreseeable harm to Plaintiffs' and class members' data security by implementing and maintaining adequate and reasonable cybersecurity procedures and protocols to protect Plaintiffs' and class members' PII from unauthorized disclosure.

4.      Furthermore, Defendant had a statutory duty to adequately safeguard the PII of Plaintiffs and class members imposed by Section 5 of the Federal Trade Commission Act of 1914 ("FTC Act"), which prohibits "unfair … practices in or affecting commerce."  The Federal Trade Commission ("FTC") has interpreted Section 5 of the FTC act as providing liability against companies for failing to use reasonable measures to protect PII.  *See In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 408 (E.D. Va. 2020).

5.      However, on June 1, 2024, vx-underground ("VXUG"), an educational website dedicated to spreading cybersecurity awareness, reported that Defendant's database of  "over 3

---

[1]About Us, NATIONAL PUBLIC DATA, https://nationalpublicdata.com/about-us.html (last visited August 26, 2024).

[2]Databases, NATIONAL PUBLIC DATA,  https://nationalpublicdata.com/databases.html (last visited August 26, 2024).

billion records" was posted on the "Dark Web" for sale for $3.5 million by the cybercriminal group known as USDoD, which had improperly accessed the data on Defendant's network (the "Data Breach").[3] Subsequently, Defendant confirmed that there had been a "security incident" in a post on its website which acknowledged that a third-party bad actor had hacked its network and gained unauthorized access to the names, email addresses, telephone numbers, Social Security numbers, and mailing addresses.[4]

6.      Defendant breached its duty to Plaintiffs and class members when it failed to implement and maintain adequate cybersecurity procedures and protocols to safeguard Plaintiffs' and class members' PII, resulting in the unauthorized disclosure of Plaintiffs' and class members' PII to cybercriminals and third-party bad actors.

7.      But for the Defendant's failure to implement and maintain reasonable cybersecurity protocols and procedures, Plaintiffs' and class members' PII would not have been inadvertently disclosed to hackers, making Defendant's actions a factual cause of the unauthorized disclosure.

8.      Defendant also proximately caused the unauthorized disclosure because the actions of third-party bad actors such as by clandestine hacker groups like USDoD do not constitute a superseding force that would relieve Defendant of liability because misappropriation of PII for unlawful purposes by cybercriminals is a reasonably foreseeable result of an unauthorized disclosure of PII by a data broker.

---

[3]@vxunderground, X, (June 1, 2024),
https://x.com/vxunderground/status/1797047998481854512?lang=en.

[4]Security Incident, NATIONAL PUBLIC DATA, https://nationalpublicdata.com/Breach.html (last visited August 26, 2024).

9.      The damages suffered by Plaintiffs and class members due to the Data Breach are substantial.  The unauthorized online disclosure of an individual's PII through a data breach exposes that individual to an increased risk of identity theft as online, third-party bad actors may access the PII to commit a number of frauds against the individuals, including, but not limited to: opening fraudulent credit cards in the ID theft victim's name, stealing government benefits rightfully belonging to the victims, applying for loans in the victims' names, and accessing the victims''s bank accounts.

10.     As such, individuals who have had their PII disclosed to cybercriminals must spend time and money to ameliorate the detrimental effects of the breach, usually by closely monitoring their financial accounts for unauthorized activity, contacting the three major U.S. credit reporting agencies to obtain a credit report, and placing a fraud alert on their credit file. NPD has acknowledged the aforementioned ameliorative actions are strongly advisable following an unauthorized disclosure of PII.[5] Furthermore, individuals who have had their PII disclosed in a data breach may need to continue performing these ameliorative actions for the rest of their lives, costing an unascertainable amount in lost time and money.  In fact, mitigation of the misuse of PII stolen in a data breach may not even be possible.

11.     Thus, Plaintiffs seek to remedy these harms on behalf of themselves and all other similarly situated individuals whose PII was stolen in the Data Breach.  Plaintiffs assert claims for negligence, negligence per se, unjust enrichment, breach of third-party beneficiary contract, and invasion of privacy and seek: (i) monetary damages; (ii) punitive damages; (iii) fees and costs of litigation; (iv) injunctive relief, including the adoption of reasonably sufficient practices to safeguard PII in Defendant's custody, care, and control in order to prevent incidents like the

---

[5] *Id.*

Data Breach from recurring in the future and for Defendant to provide long-term identity theft protective services and credit monitoring to Plaintiffs and class members; (v) disgorgement, and; (v) such other relief as the Court deems just and proper.

**PARTIES**

A.      **Plaintiffs**

12.     Duncan is a natural person and a resident and citizen of the State of California.

13.     Seidman is a natural person and a resident and citizen of the State of New Jersey.

B.      **Defendant**

14.     Defendant Jerico Pictures, Inc., d/b/a National Public Data, is a data broker specializing in background checks and fraud prevention.  Defendant is organized and existing under the laws of the State of Florida and has its principal place of business located at 1801 NW 126th Way, Coral Springs, Florida

**JURISDICTION AND VENUE**

15.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because at least one member of the putative class, as defined below, is a citizen of a state other than that of Defendant, there are more than 100 putative class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

16.     This Court has general personal jurisdiction over NPD because it maintains its principal place of business in this judicial district, regularly conducts business in this judicial district, and the acts and omissions giving rise to Plaintiffs' claims emanated from within this judicial district.

17.     Venue in this district is proper under 18 U.S.C. §1391(b) because Defendant maintains its principal place of business in this judicial district, and a substantial part of the acts and omissions giving rise to Plaintiffs' claims occurred in this district, including Defendant's collecting and storing of the PII of Plaintiffs and putative class members.

## FACTUAL BACKGROUND

**A.     Defendant Collects, Stores, and Maintains Huge Amounts of Personally Identifiable Information**

18.     Defendant is a former film production company turned data broker that "many businesses use … to obtain criminal records, background checks, and more all via XML integration."[6]

19.     As part of its business model, Defendant imports information from public record sources online and saves them onto local files on their servers—a process colloquially known as "data scraping."  Defendant then uses those records obtained from public sources to compile individual user profiles which contain the PII of these individuals including, but not limited to, their full names, email addresses, Social Security numbers, telephone numbers, and mailing addresses.

20.     Thus, Plaintiffs and putative class members are not current or former customers of Defendant, but rather, had their data "scraped" by Defendant without their consent.  Generally, federal law does not permit or enable consumers to see, make corrections to, or opt out of data compiled by brokers.  However, some states provide consumers the legal option to opt-out of having their scraped PII compiled and sold by data brokers.  Defendant, for example, states on its website "[i]f you are a California, Virginia, Colorado, Connecticut, or Utah resident, you have

---

[6]*See supra* n.1.

the right to opt-out of your personal information being sold by us to third parties or being shared

by us for certain advertising purposes or used in profiling."[7]

21.     Opt-out provisions notwithstanding, Defendant still collects and stores vast

amounts of data containing PII.  In fact, Defendant claims to have "over 3 billion" records

pertaining to the individuals whose data they have "scraped," including, but not limited to,

records such as criminal records, sex offender records, consumer data, marriage and divorce

records, bankruptcy records, vital records, and physician background checks.[8]

22.     To illustrate the extensive and multifarious records Defendant keeps on

individuals whose data it has "scraped," at least until January 2024, Defendant's website invited

patrons to search for records of individuals whose data it had scraped by inputting personally

identifying information of such individuals to access the record, as shown below:[9]

---

[7]Opt-Out, NATIONAL PUBLIC DATA, https://nationalpublicdata.com/optout.html (last visited
August 26, 2024).
[8]Databases, NATIONAL PUBLIC DATA, Internet Archive,
https://web.archive.org/web/20240117042155/http://www.nationalpublicdata.com/databases.html
(last visited August 26, 2024).
[9]*Id.*



23.     Thus, as Defendant carries out its ordinary course of business of selling access to the PII of individuals whose data it has scraped to private businesses and other organizations, it must necessarily store the PII of all the individuals whose records comprise the database. Although Defendant has not disclosed how many people's data was exposed in the Data Breach, considering that the total number of records leaked was approximately 3 billion, thousands if not millions of people's PII is presumably compromised by this incident.

24.     Despite the fact that Defendant stored the PII of an enormous amount of people, upon information and belief, the PII it stored was never encrypted by NPD, in contravention of standard cybersecurity protocols.

25.     Furthermore, as of the writing of this Complaint, Defendant still has not sent out individual notice to the people whose data was exposed in the Data Breach.  In fact, Duncan

received notice that his PII was found on the Dark Web as a result of the NPD Data Breach not from Defendant, but from four different ID fraud/theft prevention services he uses: ID Care, Credit Wise, ID Me, and Equifax.  So far, the only notice that Defendant has given regarding the Data Breach is a post on its website entitled "Security Incident," which merely provides that "[t]here appears to have been a data security incident that may have involved some of your personal information."[10] By way of details of the "security incident," Defendant simply discloses "[t]he incident is believed to have involved a third-party bad actor that was trying to hack into data in late December 2023, with potential leaks of certain data in April 2024 and summer 2024."[11]

26.     However, the Data Breach at NPD is much more extensive than a mere "potential leak of certain data."  According to VXUG, *2.9 billion* records were stolen in the Data Breach that contained PII including, but not limited to, full names, email addresses, telephone numbers, Social Security numbers, and mailing addresses.[12] Thus, although the amount of people affected by this Data Breach is still as of yet unascertained, however discovery will certainly reveal that an astronomical amount of people's data security has been compromised by this "security incident."

**B.      The Data Breach**

27.     Defendant has given no details of the Data Breach apart from the notice posted to its website that a "third-party bad actor" was "trying to hack" into its data in December 2023 with a "potential leak" of data in April 2024.  But according to VXUG, in and around April 2024

---

[10]*See supra* n. 4.
[11]*Id.*
[12]*See supra* n. 3.

a hacker group calling itself "USDoD" posted a large database stolen from Defendant on the

Dark Web and offered it up for sale for $3.5 million.[13]

28.    The authenticity of the data was confirmed by VXUG, which received a copy of

the leaked database, and upon review found that the data it contained was real and accurate.[14]

VXUG also made the following findings regarding the Data Breach:

    a.    The database contained information on deceased individuals, some of
          whom have been deceased for over two decades

    b.    Persons who did not use a data opt-out service and resided in the United
          States were immediately found in the database, along with their:

          (1)    First Name

          (2)    Last Name

          (3)    Address

          (4)    Address history for three+ decades

          (5)    Social Security Number

          (6)    Information on their parents and nearest siblings

          (7)    In some cases, information regarding uncles, aunts, and cousins

    c.    USDoD was only a "middleman" for the initial posting of the stolen
          database and credit for the compromise should be given to an individual
          operating under the moniker, "SXUL."[15]

29.    From these facts, it is apparent that Defendant failed to redact or even encrypt the

highly sensitive PII it compiles and stores on its computer systems as part of its routine business

operations, in contravention to basic cybersecurity protocols.  This failure to encrypt such

---

[13]Umar Shakir, "The Weirdest '3 billion people' Data Breach Ever," THE VERGE (Aug. 14, 2024),
https://www.theverge.com/2024/8/14/24220212/national-public-data-breach-social-security-3-
billion.
[14]*See supra* n. 3.
[15]*Id.*

sensitive PII constituted a negligent act and/or omission which deleteriously compromised the data security of Plaintiffs and putative class members, which could potentially be irreversible and last for their respective lifetimes.  Such harms include the diminution of the inherent monetary value of Plaintiffs and class members' undisclosed PII, but also the time and money Plaintiffs and class members will have to spend to ameliorate the detrimental effects of having their PII disclosed online to cybercriminals, including and not limited to, closely monitoring their financial accounts and placing fraud alerts on all their financial accounts.

C. **Data Broker Companies Are Increasingly Susceptible to Data Breaches, Giving Defendant Ample Notice That They Are Likely Cyberattack Targets**

30.     Large data brokerages like Defendant are well-aware of the numerous, large scale data breaches that have occurred throughout the United States and internationally, and of their responsibility for safeguarding the PII and other private customer information in their possession.  Such breaches have become frequent and widespread.  Thus, at all relevant times, Defendant knew, or should have known, that the PII and other private information it was entrusted with was a target for malicious actors.  In particular, Defendant knew this given the unique type and the significant volume of data on its networks, software, servers, and systems, comprising individuals' detailed and confidential PII and, thus, the significant number of individuals who the exposure of the unencrypted data would harm.  As custodian of Plaintiffs'

and class members' PII, NPD knew or should have known the importance of protecting their PII, and of the foreseeable consequences and harms to such persons if any data breach occurred.

31.     In 2023 alone, 3,205 data breaches occurred, resulting in more than 353 million individuals' sensitive records in the United States being exposed.[16] The 3,205 reported data breaches are a sharp increase from 2022, when 1,802 data breaches occurred.[17] With the surging number of such attacks, NPD should have known that it was at a high risk of a cyberattack and should have taken additional and stronger precautions and preemptive measures.

32.     Additionally, in light of recent high profile data breaches at other industry leading companies, including MOVEIt (90 million records, June 2023), LastPass/GoTo Technologies (30 million records, August 2022), Neopets (69 million records, July 2022), WhatsApp (500 million records, November 2022), Twitter (5.4 million records, July 2022), Cash App (8.2 million users, April 2022), LinkedIn (700 million records, April 2021), Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estée Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), Advanced Info Service (8.3 billion records, May 2020), and others, Defendant knew or should have known that the PII that it collected and maintained would also be specifically targeted by cybercriminals.

---

[16]Annual Number of Data Compromises and Individuals Impacted in the United States from 2005 to 2023, STATISTA, https://www.statista.com/statistics/273550/data-breaches-recorded-in-the-united-states-by-number-of-breaches-and-records-exposed/ (last visited February 20, 2024).

[17]*See id.*

D.    **NPD Breached Its Duties to Plaintiffs and the Class, and Failed to Comply with Regulatory Requirements and Industry Best Practices**

33.    Because Defendant was entrusted with PII and other private information at all times herein relevant, Defendant owed to Plaintiffs and the class a duty to exercise commercially reasonable methods and care in handling, using, maintaining, storing, and safeguarding the PII in its care, control, and custody, including by implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that occurred, and to promptly detect and thwart attempts at unauthorized access to its networks and systems.  Defendant also owed a duty to safeguard PII and other private information because it was on notice that it was handling highly valuable data and knew there was a significant risk it would be targeted by cybercriminals.  Furthermore, NPD knew of the extensive, foreseeable harm that would ensue for the victims of a data breach, and therefore also owed a duty to reasonably safeguard that information.

34.    Security standards commonly accepted among businesses like NPD that store PII and other private information include, without limitation:

      i.    Maintaining a secure firewall configuration;

      ii.    Monitoring for suspicious or irregular traffic to servers or networks;

      iii.    Monitoring for suspicious credentials used to access servers or networks;

      iv.    Monitoring for suspicious or irregular activity by known users;

      v.    Monitoring for suspicious or unknown users;

      vi.    Monitoring for suspicious or irregular server requests;

      vii.    Monitoring for server requests for PII or other private information;

      viii.    Monitoring for server requests from VPNs; and

      ix.    Monitoring for server requests for Tor exit nodes.

35.     The U.S. Federal Trade Commission ("FTC") publishes guides for businesses for cybersecurity[18] and protection of PII which includes basic security standards applicable to all types of businesses.[19]

36.     The FTC recommends that businesses:

i.      Identify all connections to the computers where sensitive information is stored.

ii.     Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

iii.    Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

iv.     Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

v.      Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hacker attacks.

vi.     Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

vii.    Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall

---

[18]Start with Security: A Guide for Business, FTC (June 2015), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[19]Protecting Personal Information: A Guide for Business, FTC (October 2016), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

provides is only as effective as its access controls, they should be reviewed periodically.

viii.  Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

ix.  Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.

37.     As described further below, Defendant owed a duty to safeguard Plaintiffs' and class members' PII and other private information under statute, including the FTC Act, to ensure that all information it received, maintained, and stored was secure.  The FTC Act was enacted to protect Plaintiffs and the class members from the type of conduct in which Defendant has engaged, and the resulting harms it proximately caused Plaintiffs and the class members.

38.     Under the FTC Act, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard the PII of Plaintiffs and class members.

39.     Defendant breached its duty to exercise reasonable care in protecting Plaintiffs' and class members' PII by failing to (1) implement and maintain adequate data security measures to safeguard Plaintiffs' and class members' sensitive personal information, (2) encrypt or anonymize PII within its systems and networks, (3) monitor its systems and networks to promptly identify and thwart suspicious activity, (4) delete and purge PII no longer necessary for its provision of telecommunications and software services to its clients and customers, (5) timely act upon data security warnings and alerts, (6) allowing unmonitored and unrestricted access to unsecured PII, (7) and allowing  not preventing unauthorized access to, and exfiltration of, Plaintiffs' and class members' confidential and private information.  Additionally, Defendant

breached its duty by utilizing outdated and ineffectual data security measures which deviated from standard industry best practices at the time of the Data Breach.  Through these actions, Defendant also violated its duties under the FTC Act.

40.     Defendant failed to prevent the Data Breach, and had it properly maintained and adequately protected its software, systems, servers, and networks, the Data Breach would not have occurred.

41.     Additionally, the law imposes an affirmative duty on Defendant to timely disclose the unauthorized access and theft of PII to Plaintiffs and class members so that they can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuses of their PII.  Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and class members.  In so doing, Defendant actually and proximately caused and exacerbated the harm from the Data Breach and the injuries-in-fact of Plaintiffs and class members.

42.     At all relevant times, Plaintiffs and class members have taken reasonable steps to maintain the confidentiality of their PII.

**E.     Plaintiffs' Experiences**

43.     In the course of "scraping" public record sources, Defendant acquired the PII of Plaintiffs , including their names, Social Security numbers, dates of birth, contact information, and financial information.  Plaintiffs are therefore Data Breach victims, as their PII and other private information was among the data accessed by unauthorized third parties in the Data Breach.

44.     Following the Data Breach, Plaintiffs have both experienced suspicious and/or fraudulent activity on their various accounts.

45.     On July 28, 2024, Duncan received four separate emails from his identity protection service providers (Equifax, Credit Wise, ID Care, and IDme) that his PII had been found on the Dark Web and was being offered up for sale.  The PII included his full name, email, passwords, driver's license, address history spanning the past three decades, Social Security number, information about his parents, siblings, and other relatives, as well as information on relatives who have been deceased for more than 20 years.

46.     Duncan reports that at least 10 different credit cards have been opened in his name, and that, furthermore, some unknown person or persons manipulated his bank account number on his monthly SSI payment for August 2024.  As a result of this, Duncan received his monthly SSI payment ten days later than he should have.

47.     As if that were not enough, Duncan also reports that as a result of his PII being disclosed on the Dark Web, his credit has become irreparably ruined due to the number of fraudulent transactions across his various financial accounts.

48.     Consequently, Duncan has had to spend a substantial amount of time and effort (including emotional anguish) taking ameliorative steps to mitigate the damage caused by his PII being disclosed on the Dark Web due to the Data Breach.  Although Duncan is still actively taking ameliorative steps to mitigate his damages, such actions he has already taken in this month (August 2024) include:

      a.     Reporting his identity theft to the FTC;;

      b.     Submitting an identity theft affidavit to the IRS;

      c.     Submitting an identity theft affidavit to the Social Security Office of the Inspector General;

      d.     Placing a fraud alert on his VA Disability Benefits; and

      e.     Informing his bank about his identity theft.

49.     As of the writing of this Complaint, Duncan is still monitoring his financial accounts and working on acquiring more information on the multiple credit cards that were fraudulently opened in his name.  Duncan has described the experience of being a victim of identity theft as very distressful and even triggering of the PTSD he sustained as a result of his son's death in the Iraq War.

50.     Seidman has fared similarly.  He received up to six emails informing him that his account with Fidelity (a financial services company) was hacked, which required him to contact Fidelity in order to resolve certain disputed transactions—a process which took him many hours.

51.     In addition, Seidman's email itself was hacked, along with his entire Google account.  Consequently, he had to change his email address because of this incident.

52.     Seidman also had to contact his bank to inform it of the potential for fraud on his financial accounts, as well as idtheft.com to receive a recovery plan from having his PII disclosed online to hackers.

53.     Ultimately, Seidman estimates it took him two entire workdays to complete the preliminary recommended ameliorative actions to mitigate the damage caused by the Data Breach to his various accounts.  Along with costing much effort and time he will never get back, Seidman reports that the entire experience has emotionally left him feeling violated due to the existentially disquieting nature of having one's identity stolen.

54.     Thus, as a proximate result of the Data Breach, Plaintiffs have already spent many hours dealing with its significant consequences, including time self-monitoring their accounts to search for potentially suspicious and fraudulent activity, and this time has been lost forever and cannot be recaptured.  Additionally, Plaintiffs will spend time protecting themselves from identity theft resulting from the Data Breach for the foreseeable future and beyond.

55.     Plaintiffs suffered actual injuries in the form of damages to and diminution in the value of their PII—a form of intangible property was entrusted to NPD, which was compromised as a proximate result of the Data Breach.

56.     Plaintiffs have suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse proximately resulting from their PII and other private information being obtained by unauthorized third parties and very possibly cybercriminals.

57.     Plaintiffs have a continuing interest in ensuring that their PII and other private information, which remains within Defendant's possession and control, is protected and safeguarded against future data breaches and other cybersecurity risks.

58.     Defendant deprived Plaintiffs of the earliest opportunity to guard themselves against the Data Breach's harmful effects by failing to promptly notify them about it.  As of the filing of this Complaint, Defendant still has not provided individual notice to Plaintiffs about the Data Breach.

**F.**     **Plaintiffs and the Class Suffered Actual and Impending Injuries Resulting From the Data Breach**

59.     As a proximate result of Defendant's completely irresponsible security practices, identity thieves now possess the sensitive PII of Plaintiffs and the Class.  It is well known that private information is valuable property.  Once stolen, PII can be used in a number of different malicious ways.  That information is extraordinarily valuable on the black market and incurs direct costs to Plaintiffs and the Class.  Indeed, the link between a data breach and risk of identity theft is simple, well-established, and strong.  On the Dark Web—an underground Internet black market—criminals openly buy and sell stolen PII to create "identity kits" worth up to $2,000 each that can be used to create fake IDs, gain access to bank accounts, social media accounts and

credit cards, file false insurance claims or tax returns, or rack up other kinds of expenses.[20] And, "[t]he damage to affected [persons] may never be undone."[21]

60.     Unlike simple credit card breaches at retail merchants, these damages cannot be avoided by canceling and reissuing plastic cards or closing an account.  Identity theft is far more pernicious than credit card fraud.  Criminals' ability to open entirely new accounts—not simply prey on existing ones—poses far more dangerous problems.  Identity thieves can retain the stolen information for years until the controversy has receded because victims may become less vigilant in monitoring their accounts as time passes.  Then, at any moment, the thief can take control of a victim's identity, resulting in thousands of dollars in losses and lost productivity.  The U.S. Department of Justice has reported that in 2021 identity theft victims spent approximately four hours on average to resolve problems stemming therefrom and that the average financial loss experienced by an identity theft victim was $1,160 per person.[22] Additionally, about 80% of identity theft victims reported some form of emotional distress resulting from the incident.[23]

61.     Social Security numbers are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult to change. The Social Security Administration ("SSA") stresses that the loss of an individual's Social Security number can lead to identity theft and extensive financial fraud:

---

[20]Nick Culbertson, *Increased Cyberattacks on Healthcare Institutions Shows the Need for Greater Cybersecurity* (June 7, 2021), FORBES, https://www.forbes.com/sites/forbestechcouncil/ 2021/06/07/ increased-cyberattacks-on-healthcare-institutions-shows-the-need-for-greater-cybersecurity/?sh= ca928c05650d.

[21]*Id.*

[22]Erika Harrell and Alexandra Thompson, Victims of Identity Theft, 2021, U.S. DEPARTMENT OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, BUREAU OF STATISTICS (October 2023), *available at* https://bjs.ojp.gov/document/vit21.pdf.

[23]*Id.*

> Identity theft is one of the fastest growing crimes in America. A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, when they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought.
>
> Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[24]

62.     Even when an injured person successfully goes through the cumbersome and time-consuming process of changing their Social Security number following identity theft, the SSA cautions individuals to "[k]eep in mind that a new number probably won't solve all your problems" and "can't guarantee you a fresh start."[25]

63.     Class members' credit profiles can be destroyed before they even realize what has happened, and they may be unable to legitimately borrow money, obtain credit, or open bank accounts.  Class members can be deprived of legitimate tax refunds or, worse yet, may face state or federal tax investigations due to fraud committed by an identity thief.  And even the simple preventive step of adding oneself to a credit-fraud watch list to guard against these consequences substantially impairs class members' ability to obtain additional credit.  In fact, many experts advise victims to place a freeze on all credit accounts, making it impossible to rent a car, get student loans, buy or rent big-ticket items, or complete a major new car or home purchase.

64.     Additionally, class members will spend significant amounts of time on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach and in navigating its effects.

---

[24]Identity Theft and Your Social Security Number, U.S. SOCIAL SECURITY ADMINISTRATION (July 2021), *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf.

[25]*Id.*

65.     NPD's "security incident" notice provides no compensation or relief whatsoever to affected persons for its wrongful conduct and actions described herein.  After a severe cybersecurity incident such as the one perpetrated here, the breached company typically offers years-long free identity protection services and credit monitoring to affected individuals.

## CLASS ACTION ALLEGATIONS

66.     Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiffs seek certification of the following nationwide class (the "Nationwide Class" or the "Class"):

> All persons whose PII or other private information was compromised in the Data Breach at Jerico Pictures, Inc. d/b/a National Public Data (and each person a "Class Member(s)").

67.     Excluded from the Nationwide Class are governmental entities, Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Nationwide Class are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

68.     This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3) and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of these rules.

69.     _Numerosity Under Rule 23(a)(1)_.  The Nationwide Class is so numerous that individual joinder of all members is impracticable, if not impossible, and the disposition of the claims of all members of the Nationwide Class in a single action will provide substantial benefits to the parties and the Court.  Although the precise number of members of the Nationwide Class is unknown to Plaintiffs at this time, on information and belief, potentially millions of people have been affected.  Discovery will reveal, through Defendant's records, the number of members of the Nationwide Class.

70.     _Commonality Under Rule 23(a)(2)_.  Common legal and factual questions exist

that predominate over any questions affecting only individual members of the Nationwide Class.

These common questions, which do not vary among members of the Nationwide Class and

which may be determined without reference to any Nationwide Class Member's individual

circumstances, include, but are not limited to:

a.     Whether Defendant knew or should have known that its computer systems, software, servers, and networks were vulnerable to unauthorized third-party access or a cyberattack;

b.     Whether Defendant failed to utilize and maintain adequate and reasonable security and preventive measures to ensure that its computer systems, software, servers, and networks were protected;

c.     Whether Defendant failed to take reasonably available steps to prevent and stop the Data Breach from occurring;

d.     Whether Defendant owed a legal duty to Plaintiffs and Class Members to protect their PII and other private information;

e.     Whether Defendant breached any duty to protect the PII of Plaintiffs and Class Members by failing to exercise due care in protecting their sensitive and private information;

f.     Whether Defendant provided timely, accurate, and sufficient notice of the Data Breach to Plaintiffs and the Class Members;

g.     Whether Plaintiffs and Class Members have been damaged by the wrongs alleged herein and are entitled to actual, statutory, or other forms of damages and other monetary relief; and

h.     Whether Plaintiffs and Class Members are entitled to injunctive or equitable relief, including restitution.

71.     _Typicality Under Rule 23(a)(3)_.  Plaintiffs' claims are typical of the claims of the

Nationwide Class.  Plaintiffs**,** like all proposed members of the Class, had their PII compromised

in the Data Breach. Defendant's uniformly unlawful course of conduct injured Plaintiffs and

Class Members by way of the same wrongful acts and practices. Likewise, Plaintiffs and other Class Members must prove the same facts in order to establish the same claims.

72. *Adequacy of Representation Under Rule 23(a)(4)*. Plaintiffs are adequate representatives of the Nationwide Class because they are Nationwide Class Members and their interests do not conflict with the interests of the Nationwide Class. Plaintiffs have retained counsel competent and experienced in complex litigation and consumer protection class action matters such as this action, and  and their counsel intend to vigorously prosecute this action for the Nationwide Class's benefit and have the resources to do so. Plaintiffs and their counsel have no interests adverse to those of the other members of the Nationwide Class.

73. *Predominance and Superiority*. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because individual litigation of each Nationwide Class Member's claim is impracticable. The damages, harm, and losses suffered by the individual members of the Nationwide Class will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' wrongful conduct. Even if each Nationwide Class Member could afford individual litigation, the Court system could not. It would be unduly burdensome if millions of individual cases or more proceeded. Individual litigation also presents the potential for inconsistent or contradictory judgments, the prospect of a race to the courthouse, and the risk of an inequitable allocation of recovery among those individuals with equally meritorious claims. Individual litigation would increase the expense and delay to all parties and the Courts because it requires individual resolution of common legal and factual questions. By contrast, the class action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

74.     As a result of the foregoing, class treatment under Fed. R. Civ. P. 23(b)(2) and (b)(3) is appropriate.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Negligence
### (*On Behalf of Plaintiffs and the Nationwide Class Against Defendant*)

75.     Plaintiffs incorporate by reference and reallege paragraphs 1-?? as if fully set forth herein.

76.     Without Plaintiffs or Class Members' consent, Defendant solicited, gathered, and stored the PII of Plaintiffs and Class Members with the intention of selling it to businesses and other third-party organizations for profit.  Although Plaintiffs and Class Members are not current or former customers of Defendant, upon information and belief, Defendant made representations and assurances to its customers, including the sources that held the PII of Plaintiffs and Class Members and thereby Plaintiffs and Class Members, that the PII Defendant collected and stored would be kept confidential, that the privacy of the PII would be maintained, and that Defendant would delete any PII after it was no longer required to maintain it.  Because Defendant was entrusted with such PII at all times herein relevant, NPD owed to Plaintiffs and the Class Members a duty to exercise commercially reasonable methods and care in handling, using, maintaining, storing, and safeguarding the PII in its care, control, and custody, including by implementing industry-wide standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that occurred, and to promptly detect and thwart attempts at unauthorized access to their networks and systems.  This duty arose independently from any contract.

77.     Defendant knew, or should have known, of the risks inherent in collecting and storing massive amounts of PII, including the importance of adequate data security and the high

frequency of cyberattacks and well-publicized data breaches.  Defendant owed duties of care to Plaintiffs and Class Members because it was foreseeable that its failure to adequately safeguard their PII in accordance with state-of-the-art industry standards concerning data security would result in the compromise of that sensitive information.  Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and the Class Members' PII by failing to limit access to this information to unauthorized third parties and by not properly supervising both the way the PII was stored, used, and exchanged, and those in its employ responsible for such tasks.

78.     Defendant owed to Plaintiffs and members of the Class a duty to notify them within a reasonable timeframe of any breach to the security of their PII. NPD also owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and circumstances of the Data Breach.  This duty is required and necessary for Plaintiffs and the Class to (1) take appropriate measures to protect their PII, (2) be vigilant in the face of an increased risk of harm, and (3) take other necessary steps to mitigate the harm caused by the Data Breach.  As of the date of this filing, Defendant still has not provided individual notice of the Data Breach to the Plaintiffs or Class Members.

79.     Defendant also had a common law duty to prevent foreseeable harm to others. Defendant had full knowledge of the sensitivity and high value of the PII that it stored and the types of foreseeable harm and injury-in-fact that Plaintiffs and Class Members could and would suffer if that PII were wrongfully disclosed, leaked, accessed, or exfiltrated.  Defendant's conduct created a foreseeable and unreasonable risk of harm to Plaintiffs and Class Members, who were the foreseeable victims of Defendant's inadequate data security practices.

80.     Defendant violated its duties to implement and maintain reasonable security procedures and practices, including its failure to even encrypt the PII it had stored on its network. Defendant's duties also included, among other things, designing, maintaining, and testing its information security controls to ensure that the PII in its possession was adequately secured by, for example, encrypting or anonymizing sensitive personal information, installing intrusion detection and deterrent systems and monitoring mechanisms, and using access controls to limit access to sensitive data.

81.     Defendant's duties of care also arose by operation of statute.  Pursuant to the FTC Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard the PII of Plaintiffs and Class Members.

82.     The FTC Act was enacted to protect Plaintiffs and the Class Members from the type of wrongful conduct in which Defendant engaged.

83.     Defendant breached its duties to exercise reasonable care in protecting Plaintiffs' and Class Members' PII by failing to (1) implement and maintain adequate data security measures to safeguard Plaintiffs' and Class Members' sensitive personal information, (2) encrypt or anonymize PII within its systems and networks, (3) monitor its systems and networks to promptly identify and thwart suspicious activity, (4) delete and purge PII no longer necessary for the provision of background check services to its clients and customers, as well as allowing unmonitored and unrestricted access to unsecured PII and allowing (or failing to prevent) unauthorized access to, and exfiltration of, Plaintiffs' and Class Member's confidential and private information.  Additionally, Defendant breached its duties by utilizing outdated and ineffectual data security measures which deviated from standard industry best practices at the

time of the Data Breach.  Through these actions, Defendant also violated its duties under the FTC Act.

84.     The law imposes an affirmative duty on Defendant to timely disclose the unauthorized access and theft of PII to Plaintiffs and Class Members so that they can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuses of their PII.  NPD further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members.  In so doing, Defendant actually and proximately caused and exacerbated the harm from the Data Breach and the injuries-in-fact of Plaintiffs and Class Members.  Timely disclosure was necessary so that Plaintiffs and Class Members could, among other things: (i) purchase identity theft protection, monitoring, and recovery services; (ii) flag asset, credit, and tax accounts for fraud; (iii) purchase or otherwise obtain credit reports; (iv) place or renew fraud alerts on a quarterly basis; (v) closely monitor loan data and public records; (vi) change or update passwords on their various accounts; and (vii) take other meaningful steps to protect themselves and attempt to avoid or recover from identity theft and other harms.

85.     Defendants had the financial and personnel resources necessary to deploy robust cybersecurity protocols and controls, and to prevent the Data Breach, but nevertheless failed to adopt reasonable data security measures, in breach of the duties it owed to Plaintiffs and Class Members.

86.     Plaintiffs and Class Members had no ability to protect their PII once it was in Defendant's possession and control.  Defendant was in an exclusive position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

87.     But for Defendant's breach of its duties to adequately protect Class Members' PII, Class Members' PII would not have been stolen.  As a result of Defendant's negligence, Plaintiffs and Class Members suffered and will continue to suffer the various types of damages alleged herein.  There is a temporal and close causal connection between Defendants' failure to implement adequate data security measures, the Data Breach, and the harms suffered by Plaintiffs and Class Members.  Thus, Defendant is the factual cause of Plaintiffs' and Class Members' harm.

88.     Furthermore, Defendant is the proximate cause of Plaintiffs' and Class Members' harm because the actions of third-party bad actors such as hackers do not constitute a superseding force that would relieve Defendant from liability, as the misappropriation of PII for unlawful purposes by cybercriminals is an unambiguously foreseeable consequence of a data broker such as Defendant.

89.     As a direct and traceable result of Defendant's negligence, Plaintiffs and the Nationwide Class have suffered or will suffer an increased and impending risk of fraud, identity theft, damages, embarrassment, humiliation, frustration, emotional distress, and lost time and out-of-pocket costs to mitigate and remediate the effects of the Data Breach. These harms to Plaintiffs and the Class Members include, without limitation: (i) loss of the opportunity to control how their personal information is used; (ii) diminution in the value and use of their personal information entrusted to Defendant; (iii) the compromise and theft of their personal information; (iv) out-of-pocket costs associated with the prevention, detection, and recovery from identity theft and unauthorized use of financial accounts; (v) costs associated with the ability to use credit and assets frozen or flagged due to credit misuse, including increased costs to use credit, credit scores, credit reports, and assets; (vi) unauthorized use of compromised

personal information to open new financial and other accounts; (vii) continued risk to their personal information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the personal information in its possession; and (viii) future costs in the form of time, effort, and money they will need to expend to prevent, detect, contest, and repair the adverse effects of their personal information being stolen in the Data Breach.

90.     Defendant's negligence was gross, willful, wanton, and warrants the imposition of punitive damages given the clear foreseeability of a hacking incident, the extreme sensitivity of the private information under Defendant's care, and its failure to take adequate remedial steps, including prompt notification to Class Members following the Data Breach.

91.     Plaintiffs and Class Members are entitled to all forms of monetary compensation set forth herein, including monetary payments to provide adequate long-term identity protection services. Plaintiffs and Class Members are also entitled to the injunctive relief sought herein.

**SECOND CAUSE OF ACTION**
**Negligence *Per Se***
***(On Behalf of Plaintiffs and the Nationwide Class Against Defendant)***

92.     Plaintiffs incorporate by reference and reallege paragraphs 1-65 as if fully set forth herein.

93.     Pursuant to the FTC Act, 15 U.S.C. § 45, NPD had a duty to maintain fair and adequate computer systems and data security practices to safeguard Plaintiffs' and the Nationside Class's PII.

94.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect customers' PII.

The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duties to protect Plaintiffs' and the Class Members' PII.

95.     Defendant's duties to use reasonable care in protecting confidential and sensitive data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

96.     Defendant violated its duties under Section 5 of the FTC Act by failing to use reasonable or adequate data security practices and measures to protect Plaintiffs' and the Class Members' PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII that it collected and stored and the foreseeable consequences of a cybersecurity data breach, including, specifically, the immense damages that would result in the event of a breach, which ultimately came to pass.

97.     The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

98.     But for Defendant's wrongful and negligent breach of the duties owed to Plaintiffs and Class Members, Plaintiffs and the Class Members would not have been injured.

99.     The injuries and harms suffered by Plaintiffs and the Class Members were the reasonably foreseeable result of Defendant's breach of its duties.  NPD knew or should have known that it was failing to meet its duties and that the breach would cause Plaintiffs and the Class Members to suffer the foreseeable harms associated with the exposure of their PII.

100.     Defendant's various violations and its failure to comply with the applicable laws and regulations referenced above constitutes negligence *per se*.

101.     As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and the Class Members have suffered harm, including loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; lost control over the value of PII; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen PII, entitling them to damages in an amount to be proven at trial.

102.     Additionally, as a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and Class Members have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as NPD fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

### THIRD CAUSE OF ACTION
### Unjust Enrichment
### (*On Behalf of Plaintiffs and the Nationwide Class Against Defendant*)

103.     Plaintiffs incorporate by reference and reallege paragraphs 1-65 as if fully set forth herein.

104.     Plaintiffs and Class Members had their PII "scraped" by Defendant as part of its regular business practices of storing and collecting records on individuals whose data they had scraped in order to sell them to third-party businesses and organizations.  Thus, Plaintiffs and Class Members conferred a pecuniary benefit to Defendant when they provided their PII to Defendant's clients who used its background check and fraud prevention services.

105.     Defendant knew that Plaintiffs and Class Members conferred a pecuniary benefit to Defendant's clients and thereby Defendant, and Defendant accepted and retained that benefit.

Defendant profited from this pecuniary benefit as its clients must transmit Plaintiffs' and Class Members' PII to Defendant as an essential part of Defendant's business. Without Plaintiffs' and Class Members' PII, Defendant would not be able to offer background check services to its clients and it would not make a profit.

106.    Under principles of equity and good conscience, Defendant should not be permitted to retain the pecuniary benefit it gained from scraping Plaintiffs' and Class Members' PII because Defendant failed to adequately safeguard that PII by not implementing or paying for reasonable and standard cybersecurity procedures and protocols.

107.    Plaintiffs and the Class Members have no adequate remedy at law. Defendant continues to retain their PII while exposing this sensitive and private information to a risk of future data breaches while in Defendant's possession. Defendant also continues to derive a financial benefit from using Plaintiffs' and Class Members' PII.

108.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs and Class Members have suffered various types of damages as alleged herein.

109.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds received by it because of its misconduct described herein and the Data Breach.

## FOURTH CAUSE OF ACTION
### Breach of Third-Party Beneficiary Contract
#### (*On Behalf of Plaintiffs and the Nationwide Class Against Defendant*)

110.    Plaintiffs incorporate by reference and reallege paragraphs 1-65 as if fully set forth herein.

111.    Upon information and belief, Plaintiffs and Class Members allege they were the express, foreseeable, and intended beneficiaries of valid and enforceable express contracts

between NPD and its clients, contracts which, upon information and belief, included obligations to keep the sensitive PII of Plaintiffs and Class Members confidential and secure.

112.    Upon information and belief, these contracts included promises made by Defendant that included expressions and/or manifestations of intent to primarily and directly benefit Plaintiffs and Class Members because the background check services Defendant provides to its clients was for the benefit of Plaintiffs and Class Members.

113.    Upon information and belief, Defendant's representations to its clients obligated it to keep Plaintiffs' and Class Members' PII confidential and secure and to implement the necessary cybersecurity procedures and protocols to do so.

114.    Defendant materially breached its contractual obligation to keep Plaintiffs' and Class Members' PII confidential and secure when the PII was accessed without authorization by cybercriminals as part of the Data Breach.

115.    The Data Breach was a reasonably foreseeable consequence of Defendant's failure to implement or pay for standard cybersecurity protections.

116.    Plaintiffs and Class Members were directly and proximately harmed by Defendant's breaches in failing to use reasonable security measures to safely store and protect Plaintiffs' and Class Members' PII and other private information.

117.    Plaintiffs and Class Members are therefore entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**Invasion of Privacy**
(*On Behalf of Plaintiffs and the Nationwide Class Against Defendant*)

118.    Plaintiffs incorporate by reference and reallege paragraphs 1-65 as if fully set forth herein.

119.     Plaintiffs and Class Members have a legally protected privacy interest in their PII, which is and was collected, stored, and maintained by Defendant, and they are entitled to the reasonable and adequate protection of their PII against foreseeable unauthorized access, as occurred with the Data Breach.

120.     Plaintiffs and Class Members reasonably expected that Defendant would protect and secure their PII from unauthorized parties and that their private information would not be accessed, exfiltrated, and disclosed to any unauthorized parties or for any improper purpose.

121.     NPD unlawfully invaded the privacy rights of Plaintiffs and Class Members by engaging in the wrongful conduct described above, including by failing to protect their PII by permitting unauthorized third parties to access, exfiltrate, and view this private information. Likewise, NPD further invaded the privacy rights of Plaintiffs and Class Members and permitted cybercriminals to invade the privacy rights of Plaintiffs and Class Members, by unreasonably and intentionally delaying disclosure of the Data Breach, and by failing to properly identify what PII had been accessed, exfiltrated, and viewed by unauthorized third parties.

122.     This invasion of privacy resulted from Defendant's failure to properly secure and maintain Plaintiffs' and the Class Members' PII, leading to the foreseeable unauthorized access, exfiltration, and disclosure of this unguarded data.

123.     Plaintiffs' and the Class Members' PII is the type of sensitive, personal information that one normally expects will be protected from exposure by the very entity charged with safeguarding it.  Further, the public has no legitimate concern in Plaintiffs' and the Class Members' PII, and such private information is otherwise protected from exposure to the public by various statutes, regulations, and other laws.

124.     The disclosure of Plaintiffs' and the Class Members' PII to unauthorized parties is substantial and unreasonable enough to be legally cognizable and is highly offensive to a reasonable person.

125.     Defendant's willful and reckless conduct which permitted unauthorized access, exfiltration and disclosure of Plaintiffs' and the Class Members' sensitive PII is such that it would cause serious mental injury, shame, embarrassment, or humiliation to people of ordinary sensibilities.

126.     The unauthorized access, exfiltration, and disclosure of Plaintiffs' and the Class Members' PII was without their consent, and in violation of various statutes, regulations, and other laws.

127.     As a result of the invasion of privacy caused by Defendant, Plaintiffs and the Class Members suffered and will continue to suffer damages and injuries as set forth herein.

128.     Plaintiffs and the Class Members seek all monetary and non-monetary relief allowed by law, including damages, punitive damages, restitution, injunctive relief, reasonable attorneys' fees and costs, and any other relief that the Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**Injunctive / Declaratory Relief**
***(On Behalf of Plaintiffs and the Nationwide Class Against Defendant)***

129.     Plaintiffs incorporate by reference and reallege paragraphs 1-65 as if fully set forth herein.

130.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief.  Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal statutes described herein.

131.    Defendant owes a duty of care to Plaintiffs and Class Members, which required

Defendant to adequately monitor and safeguard Plaintiffs' and Class Members' PII.

132.    Defendant and their officers, directors, affiliates, legal representatives, employees,

co-conspirators, successors, subsidiaries, and assigns still possess the PII belonging to Plaintiffs

and Class Members.

133.    An actual controversy has arisen in the wake of the Data Breach regarding

Plaintiffs' and Class Members' PII and whether Defendant is currently maintaining the data

security measures adequate to protect Plaintiffs and Class Members from further data breaches

that may again compromise their PII.  Plaintiffs allege that Defendant's data security measures

remain inadequate.  Furthermore, Plaintiffs and the Class Members continue to suffer injury as a

result of the compromise of their PII and the risk remains that further compromises of their

private information will occur in the future.

134.    Under its authority pursuant to the Declaratory Judgment Act, this Court should

enter a judgment declaring, among other things, the following:

a.    Defendant owes a legal duty to adequately secure the PII of Plaintiffs and
the Class Members within their care, custody, and control under the
common law and Section 5 of FTC Act;

b.    Defendant breached its duties to Plaintiffs and the Class Members by
allowing the Data Breach to occur;

c.    Defendant's existing data monitoring measures do not comply with its
obligations and duties of care to provide reasonable security procedures and
practices that are appropriate to protect the PII of Plaintiffs and the Class
Members within Defendant's custody, care, and control; and

d.    Defendant's ongoing breaches of said duties continue to cause harm to
Plaintiffs and the Class.

135.    This Court should also issue corresponding prospective injunctive relief requiring

Defendant to employ adequate security protocols consistent with data broker industry standards

to protect the PII of Plaintiffs and the Class within its custody, care, and control, including the

following:

    a.    Order Defendant to provide lifetime credit monitoring and identity theft insurance and protection services to Plaintiffs and Class Members; and

    b.    Order that, to comply with its obligations and duties of care, Defendant must implement and maintain reasonable security and monitoring measures, including, but not limited to:

        i.    Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems, networks and servers on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

        ii.    Encrypting and anonymizing the existing PII within its servers, networks, and systems to the extent practicable, and purging all such information which is no longer reasonably necessary for Defendant to provide adequate background check services to its clients and customers;

        iii.    Engaging third-party security auditors and internal personnel to run automated security monitoring;

        iv.    Auditing, testing, and training its security personnel regarding any new or modified procedures;

        v.    Segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems, networks, and servers;

        vi.    Conducting regular database scanning and security checks; and

        vii.    Routinely and continually conducting internal training and education to inform Defendant's internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

    136.    If an injunction is not issued, Plaintiffs and the Class Members will suffer

irreparable injury and will lack an adequate legal remedy to prevent another data breach or

cybersecurity incident.  This risk is real, immediate, and substantial.  If another NPD data breach or cybersecurity incident occurs, Plaintiffs and the Class Members will not have an adequate remedy at law because monetary relief alone will not compensate them for the serious risks of future harm.

137.     The hardship to Plaintiffs and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued.  Plaintiffs and Class Members will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued.  On the other hand, the cost of Defendant's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

138.     Issuance of the requested injunction will not disserve the public interest.  To the contrary, such an injunction would benefit the public by preventing a subsequent NPD data breach or cybersecurity incident, thus preventing future injury to Plaintiffs, Class Members and other persons whose PII would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Nationwide Class set forth herein, respectfully request the following relief:

A.     Certifying this action as a class action under Fed. R. Civ. P. 23 and appointing Plaintiffs and their counsel to represent the Class;

B.     Entering judgment for Plaintiffs and the Class;

C.     Granting permanent and appropriate injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described

herein and directing it to adequately safeguard the PII of Plaintiffs and the Class by implementing improved security controls;

D.      Awarding compensatory, consequential, and general damages, including nominal damages, as appropriate and as allowed by law in an amount to be determined at trial;

E.      Award statutory or punitive damages and penalties as allowed by law in an amount to be determined at trial;

F.      Ordering disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of its unlawful acts, omissions, and practices;

G.      Awarding to Plaintiffs and Class Members the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

H.      Awarding pre- and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper; and

I.      Granting such further and other relief as may be just and proper.

## **<u>DEMAND FOR TRIAL BY JURY</u>**

Plaintiffs hereby demand a trial by jury.


Dated: August 29, 2024                              Respectfully submitted,

                                                    */s/ Nathan C. Zipperian*
                                                    Nathan C. Zipperian (FL Bar. No. 61525)
                                                    **MILLER SHAH LLP**
                                                    2103 N. Commerce Pkwy.
                                                    Fort Lauderdale, FL 33326
                                                    Telephone: (866) 540-5505
                                                    Facsimile: (866) 300-7367
                                                    E-mail: nczipperian@millershah.com

Amber L. Schubert (*pro hac vice* forthcoming)
**SCHUBERT JONCKHEER & KOLBE LLP**
2011 Union St., Suite 200
San Francisco, CA 94123
Telephone: (415) 788-4220
Facsimile: (415) 788-0161
E-mail: aschubert@sjk.law

*Counsel for Plaintiffs Thomas Duncan*
*and Victor Seidman and the Putative Class*